56 CCPA
**Application of A. Louis DeLISLE.**
**Patent Appeal No. 8111.**

United States Court of Customs
and Patent Appeals.

March 6, 1969.

Herbert I. Sherman, Washington, D. C., Charles E. Wills, Harris, Kiech, Russell & Kern, Los Angeles, Cal., for appellant.

Joseph Schimmel, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, ALMOND and BALDWIN, Judges.

ALMOND, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the final rejection of claims 1, 2, 4, 5, 7, 9, 10 and 11 of appellant's application.[1] No claim has been allowed.

The invention relates to a process for treating growing crops to avoid damage by crop-destroying insects. The process involves dusting the growing crops with diatomaceous earth at regular intervals to maintain a coating of dust on the plants. The coating is applied to the crop from a very early stage of growth on a preventive maintenance basis to forestall infestation and to discourage subsequent infestation, in contrast to the

---

1.  Serial No. 232,863 filed October 24, 1962 for "Insecticide and Method."

more usual practice of applying insecticides to kill insects only after infestation has been observed. Affidavits filed during prosecution allegedly show that the process has yielded superior results in terms of crop yield in certain experiments conducted on growing crops of corn and alfalfa. In addition, the nontoxic nature of the diatomaceous earth is said to be more satisfactory, as compared with DDT and similar toxic insecticides, in that poisoning of beneficial insect and animal life is avoided, thus preserving the natural environment.

The claims on appeal are all method claims. Claim 1 is illustrative:

1. The method of controlling insects on growing field crops which comprises applying substantially uniformly to such crops between about 15 pounds and 35 pounds of diatomite per acre, the diatomite being approximately 325 mesh and comprising at least about 70 per cent of silica derived from diatomaceous earth and a a surface area of between about 20,-000 and 30,000 centimeters squared per gram, and continuing such application periodically through the growing season to maintain a coating of diatomite on substantially all parts of the growing crop.

The remaining claims differ in the numerical limitations recited regarding the composition of the diatomaceous earth or in the amount to be applied per acre, or in reciting application of the method to control infestation by specific insects such as the wooly worm and the Chalcid fly. These additional limitations are not, however, of such significance standing alone as to lend patentability to the claims if the basic process defined in the claims (applying diatomaceous earth to growing crops at regular intervals) should be found unpatentable. It will therefore be considered that the claims stand or fall together in this appeal.

The examiner cited the following references:

Hunt, "Journal of Economic Entomology," Vol. 40 No. 2 (1947) pages 215–219.

Bartlett, "Journal of Economic Entomology," Vol. 44 (1951) pages 891–896.

Brown, "Insect Control by Chemicals," John Wiley & Sons, Inc., New York (1951) pages 50–55.

Handbook of Insecticide Dust, Diluents and Carriers, 2nd Ed., Dorland Books, Caldwell, N. J. (1955), pages 55–70.

Hunt discusses earlier studies on the effect of the dust diluent or carrier on the toxicities of dust mixtures and concludes that the studies indicate that most diluents were toxic and that diatomaceous earth was the most toxic of the materials tested. Hunt further discloses the results of his own investigations to ascertain the toxicity of such dust diluents alone upon larvae of the Mexican bean beetle. As one result of these tests it was found that after 68 hours an 85 per cent average mortality figure was obtained for larvae placed in a dish to feed on a bean leaf dusted with a diatomite.

The Bartlett article discusses problems arising due to the adverse effects of wind-blown dust in reducing the numbers of beneficial predator insects available to prey upon insect pests in an insect infested area. Bartlett comments on the effect of such dust in killing the predator insects and states:

The highly lethal effect of dry dusts to parasitic Hymenoptera seems to offer a plausible explanation for observed increased scale densities along dusty roadways, particularly if, as supposed, the parasites avoid such adverse residues. Under field conditions, freshly deposited dry dust residues may be considered the prime source of parasite inhibition, and the effects of older deposits previously exposed to dewfall may be largely discounted.

Bartlett conducted tests of the effects of dust on two species of parasitic Hymenoptera by transferring the insects to test cells after ether inactivation and holding them with uninterrupted exposure to the dust for the extent of the test.

**1388**

Exposure to diatomite dust of under two hours produced a 50 per cent kill.

The Brown treatise discusses dust diluents which are mixed in high volumes with powdered insecticide to facilitate the operation of dusting machines. Referring to diatomaceous earth as a diluent, Brown states:

Diatomaceous earths are highly abrasive to the insect cuticle and alone can cause as much as 85% mortality of beetles.

Inasmuch as we are persuaded by a reading of the briefs of the two parties that the statement quoted above from Brown was a reference to the work of Hunt, it seems unnecessary for us hereafter to give a separate treatment to the Brown reference as well as to Hunt.

The remaining reference, The Handbook of Insecticide Dust, was cited primarily against two composition claims which have been canceled and refers to the use of diatomaceous earth as conditioning agents or as primary carriers for high concentrations of insecticidal dust.

The examiner rejected the claims under 35 U.S.C. § 103 taking the view that Bartlett, Brown and Hunt disclosed the use of diatomite as an insecticide and that the manner of its application would be obvious, stating in the examiner's Answer:

The selection of application times is viewed as being a matter of choice for those in the art. Certainly the result obtained is not unexpected, but rather obvious, i. e. the control of insects.

\* \* \* \* \* \*

Furthermore it is the examiner's contention that the selection of a particular insecticide and the particular method and time of application are expedients well within the skill of the art and it remains for those in the art to make such selections depending on the environment, insects, and other pertinent factors, of each situation.

The board affirmed the rejection of the claims, stating:

Appellant's arguments turn essentially about the alleged failure of the references to disclose the dusting of plants with only non-poisonous diatomaceous material prior to infestation of insects and thus maintain a "balance of nature" during crop growth.

The board found that this argument lacked support in the claims inasmuch as, by reciting a method which "comprises," they did not exclude the presence of the known toxic insecticides. The board then added:

Since the claims do not exclude the use of dust having ingredients other than diatomaceous material they differ from the references only in the recitation of specific values for the degree of fineness and the quantity of material used. However, we find nothing in the record to establish criticality in these values. Furthermore, the degree of fineness and the amount of dust deposited on plants is obviously a matter of choice determined by the thickness of layer desired and the time interval it is to be maintained.

Appellant states that the board misunderstood his argument since he does not take the position that his claims are limited to the use of *only* purified diatomaceous earth. Despite this position, there is considerable discussion in the specification and brief concerning the serious limitations of modern toxic insecticides due to the accumulation of their poisonous residues in the organisms of warm blooded animals, including man, causing impaired health and even death. Beneficial insects, lizards and birds are said to be often absent from fields treated by such toxic insecticides. Implicit in this discussion is an argument that an insecticide free from such harmful side effects would have been eagerly sought by workers skilled in the art. In view of recent public concern voiced about the dangers posed by the side effects of poisonous insecticides, this would appear to be a plausible argument; however, since appellant has expressly stated that he is not relying on a use of diatomaceous earth alone, we need not consider it further.

Appellant argues that none of the references teaches or suggests controlling *insects* on *growing crops* which includes the dusting of the crops with diatomite material (with or without a botanical insecticide) at *periodic intervals* to maintain a coating of diatomite on the growing crops regardless of the absence of insect infestation.

We disagree. Admittedly the references are not as explicit as the claim language; however, the issue of obviousness is not determined by what the references expressly state but by what they would reasonably suggest to one of ordinary skill in the art. In re Siebentritt, 372 F.2d 566, 54 CCPA 1083. While the works of Hunt and Bartlett were restricted to laboratory studies on the lethal effect of diatomaceous earth on particular species of insects, we are of the opinion that results of these studies suggest to one of ordinary skill in the art that diatomite can be used to control insects on growing plants especially since its application to growing crops as a diluent or carrier for toxic insecticides is well known and such application is within the scope of the claims on appeal. Nor do we find unobviousness in appellant's preventive maintainance concept of repeated application at stated intervals to maintain a coating of diatomite on the plants and to coat new growth as it develops. It seems to us that one skilled in the art would either reapply the diatomite when the effectiveness of the previous application had worn off or, after observing several instances of decreased effectiveness, schedule a series of periodic applications. The mere fact that new growth, uncovered by diatomite, appears would seem to require a new application to that area. Regarding the presence or absence of insects, we note that the claims are silent on that matter.

Appellant directs our attention to two affidavits as showing the "commercial success of obtaining increased yields of substantially damage-free grain and seeds with applicant's 'preventive maintenance' method, as compared with the smaller amounts of damaged grain and seed obtained by spraying with toxic insecticides *after infestation* has occurred * * *." [Emphasis supplied.] We have carefully considered these affidavits but are not convinced that the rejection on the combined references is in error.

The decision of the board is, accordingly, affirmed.

Affirmed.